IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 20, 2015

## STATE OF TENNESSEE v. JAMES W. GROOMS, JR.

**Appeal from the Criminal Court for Hawkins County
No. 11-CR-0355      Thomas J. Wright, Judge**

---

**No. E2014-00668-CCA-R3-CD – Filed July 30, 2015**

---

The Defendant-Apellant, James W. Grooms, Jr., was convicted by a Hawkins County jury of two counts of aggravated assault, for which he received an effective sentence of four years and six months' confinement.  On appeal, the Defendant asserts that (1) the trial court committed plain error by instructing the jury that aggravated assault was a lesser-included offense of attempted first degree murder, and (2) the evidence is insufficient to sustain his conviction for aggravated assault.  Upon our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and D. KELLY THOMAS, JR., J., joined.

Gerald L. Gulley, Jr., Knoxville, Tennessee, for the Defendant-Appellant, James W. Grooms, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Kevin Keeton, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

This appeal stems from an altercation that occurred on April 13, 2011, between the Defendant, Bobby Wolf, and Tessaria Monika Childress.  During the altercation, the Defendant hit Childress with the handle of a pistol and shot Wolf in the groin area of his right leg.  The Defendant was subsequently indicted for attempted first degree murder of Bobby Wolf, aggravated assault of Tessaria Childress, and employing a firearm during the attempt to commit a dangerous felony.

At trial, Childress testified that in April 2011, she was in a romantic relationship with Wolf, and the couple was living together at the home of Krista Arnwhine, along with Childress's three children and Arnwhine's two children. Childress had known the Defendant for several years at the time of the incident. During that time, he sent Childress "vulgar" text messages and made "verbal advances" towards her. Childress told Wolf about the Defendant's advances, and he was present "a couple of times" when the Defendant made inappropriate comments to Childress. Childress rebuffed the Defendant's advances, but it "didn't deter him."

On April 13, 2011, Childress was cooking dinner when Arnwhine told her that Wolf was outside arguing with somebody. Childress looked outside and saw the Defendant with his dog on a long chain arguing with Wolf. Childress believed that the Defendant was intoxicated "by the way he was talking, kind of slurring his words and . . . staggering around." Childress told the Defendant to go home and told Wolf to return inside, and as she and Wolf walked back towards the house, the Defendant yelled something at her. Because she could not hear him, she stepped towards him and said, "[W]hat did you say?" At that point, the Defendant pulled out a gun and hit her with its handle "at least five times[.]" Childress yelled for Wolf to help her and when she turned her head, she felt the barrel of the gun pressed against the side of her head. She felt "[s]cared to death" and thought the Defendant was going to "blow [her] brains out[.]" The Defendant briefly lowered the gun when Wolf approached but raised it "halfway up" and pointed it at Wolf, who stepped back, put his hands up, and said, "[W]hoa[.]" The Defendant shouted, "[N]ow, mother-f*****," and shot Wolf. Wolf fell to the ground and yelled, "[H]e shot me in the [testicle], call 911." Childress told Arnwhine to call 911 while she drove Wolf to the hospital.

Childress testified that neither she nor Wolf had been drinking that evening, and Wolf was not armed with any weapons during the altercation with the Defendant. She stated that she was in fear for her life and suffered bruising on her neck, arms, and face from the attack by the Defendant. On cross-examination, she agreed that she did not seek medical treatment for her injuries, although a doctor did examine her at the hospital on the night of the incident. She also agreed that Wolf is known for being "somewhat" violent.

Wolf testified that on the night of the incident, he walked outside to take out the trash and saw the Defendant walking his dog. Wolf had known the Defendant for several years and waved at the Defendant as he walked by. In response to this gesture, the Defendant stated, "I don't associate with snitches and bitches." Wolf did not know what the Defendant meant by this comment but responded, "[Y]ou don't know who you are talking to," and an argument ensued between the two men. Wolf thought the Defendant was intoxicated because he had "slurred speech and stagger[ed] like he was drunk," so

-2-

Wolf told him to go home. At that point, the Defendant pulled out a black pistol and told Wolf, "I'll shoot you here on the spot." Wolf responded, "[I]f you are going to point it at me, you had better use it." Wolf testified that he did not have any weapons on him and never stepped in the road towards the Defendant.

During the argument, Childress came outside and encouraged Wolf to go back inside the house. Wolf walked inside to get his cigarettes, and when he returned outside, he saw the Defendant strike Childress with the handle of his pistol. Wolf stated that he was in fear for Childress and ran towards her to "jerk her away" from the Defendant, at which point the Defendant shot Wolf. Wolf testified that he did not threaten the Defendant with any weapon and was not holding anything that the Defendant might have mistook for a weapon. He also stated that Childress did not do anything to the Defendant other than "[t]rying to get him to go home" before he began hitting her with the pistol. As a result of the shooting, Wolf had to undergo surgery and had his right testicle removed.

Dr. Daniel Anderson, a surgeon at Holston Valley Medical Center, treated Wolf on the night of the incident and testified as an expert in medical treatment. He testified that a gunshot wound to the groin area can "absolutely" create a substantial risk of death because the femoral artery and femoral vein run through the groin and, if damaged, can result in death or loss of limb. Wolf had a wound "through and through" the soft tissue in the right groin and a wound to his right scrotum, which required removal of Wolf's right testicle. Wolf's wounds were not life-threatening, but Dr. Anderson testified that he would expect Wolf "to have quite a bit of acute pain" during the episode and as he recovered.

Corporal Chad Britton and Detective Chad Evans of the Hawkins County Sheriff's Office responded to the scene that evening. Corporal Britton located the Defendant standing outside of his parents' house and searched him for weapons. He found a loaded 9 millimeter handgun in the Defendant's back pocket and recalled that although the Defendant complied with his commands, he appeared intoxicated. Detective Evans likewise testified that the Defendant appeared "very much" intoxicated, and as a result, Detective Evans did not question the Defendant about the incident that evening. He and Corporal Britton searched the scene that night for weapons and other evidence but did not find anything. They returned to the scene the following morning and found a shell casing in the road near Arnwhine's home. Later that morning, Detective Evans read the Defendant his Miranda rights, and the Defendant signed a waiver of rights form. He then provided the following statement, which was introduced into evidence and read to the jury:

-3-

Last night at about dusk[,] my dog got off his chain. I went walking and found him. I started back to the house. As I was coming back . . . , I was going by a trailer and Bobby Wolf was in the yard, [and] we got into an argument. He jumped off his porch and came to the road and started arguing. Monika [Childress] got in between us and broke us up. She made [Wolf] go in the house and started escorting me down the road. As [Wolf] was going in the house, he said ["]I've got something for you, mother f'er.["] [Childress] continued walking me down the road. We got about fifty feet and [Wolf] jumped off the porch again and started running toward me, he was saying he was going to shoot me. [Childress] r[an] toward [Wolf] trying to stop him when he knocked her down and continued on toward me. I pulled up my pistol and told him to stop, he kept coming, [and] I shot him. I was just trying to hit him in the kneecap, I just wanted to wing him. He fell. I went to my mother's house and told her to call 911. I sat down and waited for the law. . . . When the shooting happened, I was sober. When I got to my parents' house, I got real nervous and knew I was going to jail. I got a bottle of Vodka and drank it like water, my nerves were shot.

Krista Arnwhine testified that she knew Wolf through his relationship with Childress and did not know the Defendant. On the night of the incident, she recalled that Wolf went outside when he heard a dog barking. She looked outside and saw Wolf talking with the Defendant. Wolf returned inside, and Childress went outside to tell the Defendant to go home. Arnwhine testified that the Defendant and Childress were "going back and forth" arguing, and then the Defendant "pulled the gun out and started hitting [Childress]." She described these blows as "pretty forceful" and estimated that he hit her "at least ten" times. Arnwhine stated that when Wolf ran towards the Defendant to help Childress, the Defendant turned towards him and shot him. Arnwhine testified that the altercation took place at the edge of her yard and the road, and after the shooting, the Defendant walked home. On cross-examination, Arnwhine testified that the Defendant first pointed the gun at Childress, which prompted Wolf to run towards them in an attempt to help Childress. She agreed that the Defendant fired only one shot.

Helen Grooms, the Defendant's mother, testified on behalf on the defense. At the time of the incident, the Defendant lived with his wife and children near her home. She recalled that on April 13, 2011, the Defendant cooked dinner at her house and left around 7 p.m. to feed his dogs. He returned to her house "close to dark" and told her, "[C]all 911, I just had to shoot Bobby Wolf." After she called 911, the Defendant sat on her front porch to wait for the police. She denied that he drank any alcohol earlier in the evening but testified that he drank "quite a bit" while waiting for the officers to arrive because his "nerves w[ere] tore up." She stated that the morning after the shooting, she

and her husband found a knife at the scene of the incident. Her husband put it in a lock box at their house, and she removed it after his death and gave it to defense counsel the week of trial. She testified that she did not give the knife to police after finding it because she "thought they had done their investigation when [her husband] found it." On cross-examination, she agreed that she gave a statement to police after finding the knife but did not mention the knife. She explained that she "forgot about it to be honest."

The Defendant testified that on the night of the incident, he was walking home with his dog when he heard someone shout, "[H]ey, MF." He turned around and Wolf, who was standing at the edge of Arnwhine's property, said, "I heard you been telling people I'm a thief." The Defendant testified that he continued to walk home, but Wolf followed him "raising all kinds of threats" and "screaming and hollering" at him. When Wolf ran towards the Defendant, the Defendant pulled out a pistol and said, "[Wolf], stay away from me. . . I am just trying to get home, just stay away from me." The Defendant testified that Wolf told him that "if he pulled that pistol on [him], [he] better be ready to use it" and continued to follow him. Wolf then ran into the road, and a fistfight ensued between the two men. Childress broke up the fight and pushed Wolf back towards the house, but as he was walking away, Wolf told the Defendant, "I've got something for you MF," and ran inside of the house. The Defendant continued walking home but heard a loud "bang" and saw Wolf jump off the front porch and run towards him yelling that he was going to kill him. Childress attempted to stop Wolf, but Wolf threw her to the ground and kept "charging" at the Defendant. The Defendant raised his pistol and said, "[Wolf], stop." The Defendant explained that he planned to shoot Wolf in the kneecap and that he fired only one shot. After shooting Wolf, the Defendant walked to his parents' house and asked his mother to call 911 "to get [Wolf] some help down there" because he "didn't want him dying."

The Defendant testified that he did not drink any alcohol before the incident but "chugged" a bottle of vodka after the incident while waiting for the police to arrive. He denied that he had any type of romantic relationship with Childress or that he sent her any text messages. He also denied that he hit Childress and testified that Wolf threw her down in the road when she tried to stop him. The Defendant testified that Wolf had something in his hands as he was running towards him, but he could not tell what it was. He further testified that he did not plan to kill Wolf and stated, "I felt like I had no other choice but to do what I did." On cross-examination, the Defendant acknowledged that he did not mention a fistfight between him and Wolf or that Wolf had anything in his hands in his statement to police. He testified that he never intended to kill Wolf and that he shot him in the leg "just trying to stop [him]."

Following deliberations, the jury convicted the Defendant of two counts of aggravated assault, one involving each victim. The trial court sentenced the Defendant to

concurrent sentences of four years and six months' confinement for each conviction for a total effective sentence of four years and six months. On April 4, 2014, the Defendant filed an untimely notice of appeal, which was initially dismissed by this court on May 22, 2014. Subsequently, the Defendant filed several pro se responses and a petition to rehear, after which this court vacated its previous order dismissing the appeal and reinstated the Defendant's appeal.

## ANALYSIS

**I. Jury Instructions.** The Defendant first argues that the trial court erred by instructing the jury that aggravated assault was a lesser-included offense of attempted first degree murder. The Defendant acknowledges that he failed to object at the trial level but asserts that this error rises to the level of plain error. The State responds that the Defendant agreed to an implicit amendment of the indictment by requesting a jury instruction for aggravated assault as a lesser-included offense. We agree with the State.

Every defendant has the constitutional right to be informed of the "nature and cause of the accusations." U.S. Const. amend. VI, XIV; Tenn. Const. art I, § 9. According to Tennessee Code Annotated section 40-13-202 (2003), an indictment "must state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in a manner so as to enable a person of common understanding to know what is intended and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment." The Tennessee Supreme Court has held that an indictment is valid if it contains sufficient information "(1) to enable the accused to know the accusation to which answer is required, (2) to furnish the court adequate basis for the entry of a proper judgment, and (3) to protect the accused from double jeopardy." State v. Hill, 954 S.W.2d 725, 727 (Tenn. 1997) (citations omitted). "[S]pecific reference to a statute within the indictment may be sufficient to place the accused on notice of the charged offense." State v. Sledge, 15 S.W.3d 93, 95 (Tenn. 2000) (citing State v. Carter, 988 S.W.2d 145, 149 (Tenn. 1999); Ruff v. State, 978 S.W.2d 95 (Tenn. 1998)).

"[A] defendant cannot legally be convicted of an offense which is not charged in the indictment or which is not a lesser offense embraced in the indictment." State v. Cleveland, 959 S.W.2d 548, 552 (Tenn. 1997) (citing State v. Trusty, 919 S.W.2d 305, 310 (Tenn. 1996)). However, the indictment may be amended with the defendant's consent. Tenn. R. Crim. P. 7(b)(1). In order for an indictment to be amended pursuant to Rule 7(b), "an oral or written motion to amend the indictment should be made, and the defendant's oral or written consent to the motion must be clear from the record." State v. Stokes, 24 S.W.3d 303, 303 (Tenn. 2000). Further, "[w]hen a defendant actively, yet erroneously, seeks an instruction on a lesser-included offense, the defendant effectively

consents to an amendment of the indictment." State v. Greg Patterson, No. W2011-02101-CCA-R3-CD, 2012 WL 206287, at *3 (Tenn. Crim. App. Dec. 11, 2012) (citing Demonbreun v. Bell, 226 S.W.3d 321, 326 (Tenn. 2007)); see also State v. Ealey, 959 S.W.2d 605, 612 (Tenn. Crim. App. 1997) (holding that a defendant cannot "complain about convictions on an offense which, without his own counsel's intervention, would not have been charged to the jury") (internal quotation marks and citations omitted).

In the instant case, the Defendant was indicted in count one for attempted first degree murder of Wolf but was convicted of aggravated assault as a lesser-included offense. As correctly noted by the Defendant and conceded by the State, aggravated assault is not a lesser-included offense of attempted first degree murder. See, e.g., Demonbreun, 226 S.W.3d at 324; State v. Christopher Todd Brown, No. M1999-00691-CCA-R3-CD, 2000 WL 262936, at *1-2 (Tenn. Crim. App. Mar. 9, 2000), perm. app. denied (Tenn. Sept. 10, 2001). Prior to trial, however, the Defendant filed a "Motion to Instruct All Lesser Included Offenses" and specifically requested a lesser-included jury instruction for aggravated assault under count one. The State opposed the motion and argued that aggravated assault should not be charged in count one because it is not a lesser-included offense of attempted first degree murder, but the trial court instructed the jury on the offense as requested by the Defendant. Accordingly, because the Defendant actively sought an instruction on aggravated assault in count one, the Defendant consented to an amendment of the indictment.

In resolving this issue, we note that this case is distinguishable from State v. Stokes, 24 S.W.3d 303, 306 (Tenn. 2000) where the Tennessee Supreme Court held that "a defendant's acquiescence to a jury instruction based on an incorrect belief that an offense is a lesser[-]included offense is simply insufficient to transform an erroneous jury instruction into a valid amendment of an indictment by that defendant's consent." There, the Supreme Court emphasized that "the instruction on statutory rape was suggested by the trial court as a lesser[-]included offense [of rape] and . . . the State and Stokes passively agreed in the court's proposed instruction." Id. In contrast to the mere acquiescence in Stokes, the Defendant in the instant case actively requested the erroneous instruction. He is not entitled to relief.

**II. Sufficiency of the Evidence.** The Defendant next contends that the evidence is insufficient to sustain his conviction for aggravated assault in count one. He asserts that the evidence established that he acted in self-defense and the State failed to negate this defense. The State responds that the evidence is sufficient to sustain his conviction. Upon our review of the record, we agree with the State.

When considering the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be

-7-

drawn from that evidence.  State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).  When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).  Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt."  "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict."  State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two.  State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)).  The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'"  State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d at 275).  The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence.  State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)).  Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury.  Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)).  When considering the sufficiency of the evidence, this court shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact.  Id.

Aggravated assault, as relevant here, occurs when a person intentionally or knowingly commits an assault as defined in Tennessee Code Annotated section 39-13-101(a)(1), and the assault involved the use or display of a deadly weapon.  T.C.A. § 39-13-102(a)(1)(A)(iii).  Bodily injury includes "a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty."  Id. § 39-11-106(a)(2).  Deadly weapon means "[a] firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury" or "[a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury[.]"  Id. § 39-11-106(a)(5).

In challenging the sufficiency of the evidence in the instant case, the Defendant does not contest any particular element of aggravated assault. Rather, he asserts that the State failed to disprove beyond a reasonable doubt that he acted in self-defense. Self-defense is defined as follows:

[A] person who is not engaged in illegal activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

(A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

(B) The danger creating the belief of imminent death or serious bodily injury is real or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

Id. § 39-11-611(b)(2). The jury, as the trier of fact, determines whether the defendant acted in self-defense. State v. Dooley, 29 S.W.3d 542, 547 (Tenn. Crim. App. 2000) (citing State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997)). "[I]n the context of judicial review of the jury verdict, in order to prevail, the defendant must show that the evidence relative to justification, such as self-defense, raises, as a matter of law, a reasonable doubt as to his conduct being criminal." State v. Clifton, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994). The State has the burden of negating the defendant's claim of self-defense in the event that "admissible evidence is introduced supporting the defense." T.C.A. § 39-11-201(a)(3); State v. Sims, 45 S.W.3d 1, 10 (Tenn. 2001) (citing State v. Belser, 945 S.W.2d 776, 782 (Tenn. Crim. App. 1996)).

Viewed in the light most favorable to the State, the evidence in the instant case established that the Defendant shot Wolf after an altercation between the Defendant, Wolf, and Childress. The altercation began as a verbal dispute between Wolf and the Defendant. Childress attempted to break up the fight and persuaded Wolf to return inside of their home, at which point the Defendant pulled out a pistol and hit Childress with the handle repeatedly. When Wolf tried to intervene, the Defendant shot him in the right groin area. As a result of his injuries, Wolf underwent surgery and had his right testicle removed. Although the Defendant offered conflicting testimony and asserted that he shot Wolf in self-defense, the jury evaluated the credibility of the witnesses and resolved all conflicts in the evidence in favor of the prosecution's theory. See Campbell, 245 S.W.3d at 335; State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). The trial court charged the jury on the issue of self-defense and the jury chose to reject this defense, as was its prerogative. See Goode, 956 S.W.2d at 527 (citing State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993)). We will not reweigh this evidence or second-guess the jury's

decision on appeal.  Based upon the evidence presented, a rational jury could find the Defendant guilty of aggravated assault against Wolf.  He is not entitled to relief.

## **CONCLUSION**

Based on the foregoing authority and analysis, we affirm the judgment of the trial court.

_____
CAMILLE R. McMULLEN, JUDGE